## Tous Soto, Demandante y Apelante, *v.* Chevremont, Demandado y Apelado.

Apelación procedente de la Corte de Distrito de San Juan, Sección Segunda, en pleito sobre indemnización de daños y perjuicios

No. 2384.—Resuelto en enero 19, 1923.

Daños y Perjuicios por Seducción—*Nonsuit.*—El declarar con lugar una moción de sobreseimiento (*nonsuit*) equivale a dictar sentencia fundada en una excepción previa a la prueba presentada por el demandante, y debe el tribunal conceder esta clase de mociones con gran cautela y únicamente en aquellos casos en que sea completamente clara la concesión de dicha moción.

Id.—Id.—Corroboración—Promesa de Matrimonio—Causa de Acción.—La ley no exige corroboración de la declaración de la demandante en una acción de daños y perjuicios por seducción, ni una promesa de matrimonio, como elemento imprescindible para constituir causa de acción.

Los hechos están expresados en la opinión.

Abogado del apelante: *Sr. E. López Tizol.*

Abogado del apelado: *Sr. L. Méndez Vaz.*

El Juez Asociado Sr. Hutchison, emitió la opinión del tribunal.

El artículo 58 del Código de Enjuiciamiento Civil, discutido antes en el caso de *Román* v. *Vázquez,* 29 D. P. R. 791, prescribe lo siguiente:

"Una mujer soltera puede deducir, como demandante, una acción por haber sido seducida, y para obtener por medio de dicha acción el importe de los daños pecuniarios o ejemplares que se decretasen a su favor."

En una acción así autorizada la corte inferior declaró con lugar una moción de sobreseimiento (*nonsuit*) por las razones que a continuación se transcriben:

"Es indudable que ha existido aquí una ausencia completa de prueba para lograr una sentencia favorable a la demandante y aún aquella misma que se ha traído a juicio lo ha sido de una manera insuficiente. El elemento esencial en una acción de esta naturaleza, es decir, el engaño, las falsas promesas, los artificios puestos en juego por el demandado para obligar a la supuesta ofendida a rendirse a sus deseos no ha tenido una completa demostración. Ha fal-

tado la prueba de la persistencia de los métodos empleados por el demandado para lograr que sus mentirosas promesas y sus halagos influyeran de algún modo en los sentimientos y en la mente de la perjudicada, para inclinarla a la ejecución de actos opuestos a sus deseos, y que de otro modo no hubiera ejecutado.  Aparece, por el contrario, que las frívolas promesas del demandado hechas a la demandante de disolver su matrimonio para casarse con ella, perdieron prontamente su carácter sincero y practicable, para convertirse en un convenio comercial mediante el cual la demandante aceptaba vivir en una casa que el demandado le proveyera, con el ofrecimiento de no desatender sus necesidades.

"De cualquier modo que esto haya ocurrido, es lo cierto que la única prueba que ha venido ante la corte sobre la verdad de los hechos ocurridos es la propia declaración de la supuesta ofendida sin ninguna otra evidencia directa o circunstancial que tuviera para robustecerla y corroborarla.  Si hubo un niño como resultado de aquellas uniones pasajeras, ¿qué cosa más sencilla haber demostrado su nacimiento?  Y si hubo un proceso criminal por abandono de menores, que terminó por el ofrecimiento del padre de pagar a la madre una pensión alimenticia, ¿por qué no se trajo a nuestra consideración ese reconocimiento tácito de los hechos que se imputan al demandado?  Parece que dentro del limitado círculo de los actos que se dice haber realizado el demandado había elementos de prueba de fácil utilización.

"No aseguramos que con lo que hemos indicado se hubiera formado plenamente nuestra conciencia sobre la responsabilidad del demandado.  Lo que queremos decir es que se ha confiado exageradamente en la declaración de la demandante en cuanto al elemento esencial de esta acción y no es necesario razonar cuan peligroso fuera decretar una indemnización por daños de esta clase basándonos sólo en la afirmación de una parte interesada que está incompleta aún en aquellos extremos que fácilmente hubieran podido corroborarse."

Refiriéndose a la cuestión de corroboración el juez sentenciador parece que no tuvo en cuenta varios pormenores importantes.  En la contestación se admite por medio de una negativa que implica una afirmación (*negative pregnant*) que la actora en diciembre de 1916, visitaba la oficina del demandado, que es un dentista, como pacienta suya.  Se alega además expresamente en la contestación, que el conocimiento,

que se dice era de fecha anterior al incidente referido últimamente, no tardó en ser íntimo y el cual trajo por resultado las frecuentes visitas por parte de la actora a ver al demandado en el mirador que hay en la casa de su oficina.   También expresaba la contestación, que al formularse denuncia por la demandante por abandono de menores y "a fin de evitar la publicidad que siempre adquieren los debates judiciales," el demandado consintió en pasar doce pesos mensuales para alimentos de la niña Rosalina, "sin que le sea dable afirmar que es hija suya o no, pues nunca vivió con la demandante bajo un mismo techo, ni puede asegurar tampoco que no tuviese ella tratos con otros hombres, como ya los había tenido antes de conocerla." Además, la demandante declaró que los arreglos sobre alimentos de la niña los hizo el demandado por medio de su abogado de récord en este caso, y no hubo examen de repreguntas por dicho abogado sobre este punto.   El fuerte comentario que hace la corte inferior sobre la supuesta omisión de la demandante en presentar prueba adicional relativa al nacimiento del niño, a un proceso criminal por abandono del demandado de su hijo y tratar de eludir la cuestión, o por lo menos no reconocer su responsabilidad en este sentido, carece enteramente de fundamento.

Las vagas alegaciones de la contestación que imputaban a la demandante la falta de previo carácter casto no pudieron haber recibido ninguna consideración al resolverse la moción de *nonsuit*.   Además, no obstante la presunción legal de castidad y aparte de toda cuestión relativa al peso de la prueba o a su admisibilidad en este sentido, que pudo haberse suscitado pero que no se hizo en el juicio, se admitió que dos testigos que se encontraban ausentes de haber estado presentes hubieran declarado que la demandante al ocurrir su seducción vivía en el hogar de estos testigos, una viuda, Emilia del Llano, y su hija, con quienes había vivido desde que tenía dos años de edad por un período de unos ca-

torce años; que durante todo ese tiempo la demandante observó buena conducta moral, que su conducta era la de una muchacha honesta y honrada; que ellos no tuvieron absolutamente ninguna queja en cuanto a la reputación de la demandante, y que ella gozaba de buena reputación como joven casta y pura.

"Sobreseimiento (nonsuit) es el nombre de una sentencia que se dicta contra el demandante cuando éste no puede probar su caso, o cuando rehusa o deja de proceder al juicio de un caso una vez que ha sido sometida la cuestión y sin resolverse dicha controversia. Es de dos clases, voluntario e involuntario . . . . . Un sobreseimiento (nonsuit) involuntario o compulsivo tiene lugar cuando el demandante, al ser llamado estando su caso ante la corte para la celebración del juicio, no comparece, o si no aporta ninguna prueba sobre la cual pueda el jurado emitir un veredicto." 18 C. J. 1146.

Por consiguiente, como ha declarado esta corte en el caso de *Rosado* v. *Ponce Railway & Light Co.*, 18 D. P. P. 609, cita del sumario:

"Al resolver una moción de sobreseimiento (nonsuit) por insuficiencia de la prueba del demandante, el tribunal debe admitir como ciertos todos los hechos a que se refiere la prueba presentada por el demandante. El declarar con lugar una moción de sobreseimiento (nonsuit) equivale a dictar sentencia fundada en una excepción previa a la prueba presentada por el demandante, y debe el tribunal conceder esta clase de mociones con gran cautela y únicamente en aquellos casos en que sea completamente clara la concesión de dicha moción."

El artículo 250 del Código de Enjuiciamiento Criminal prescribe, entre otros particulares, que:

"En juicio por el delito de seducción bajo promesa de matrimonio, o por violación, el acusado no podrá ser declarado convicto por la declaración de la mujer agraviada, a menos que su declaración se corrobore con otras pruebas."

Pero el presente caso no es un proceso por el delito estatutorio de seducción bajo promesa de matrimonio y no sabe-

mos de ninguna disposición legislativa que requiera, ya la corroboración de la declaración del demandante, o el hecho de hacerse la promesa de matrimonio, como elemento necesario del daño envuelto en una acción civil.

"En la ley común, la declaración de la actora o parte perjudícada, en el juicio por ofensas contra la castidad de mujeres era por sí sóla suficiente prueba para sostener una sentencia condenatoria; ni un segundo testigo ni las circunstancias corroborantes eran necesarias. . . . . En principio este resultado fué meramente un ejemplo de la falta general en nuestra ley de reglas que exijan un número determinado de testigos. En cuanto a la práctica, parece estar suficientemente justificado. En primer lugar, aplicando el principio ya sugerido al tratar de la regla de traición (ante, sec. 2037), la primera condición que justifica una regla sobre el número tal vez existe, o sea, la frecuencia de falsas acusaciones de la clase en cuestión; pero la segunda no existe, esto es, las desventajas relativamente pequeñas que sobrevendrían caso de que un hombre culpable se evadiera por la falta del número requerido de testigos, pues en ninguna de estas ofensas puede adoptarse tal criterio sobre las consecuencias de dejar impunes tales ofensas. Además, una regla de ley que requiera la corroboración, probablemente ejerce poca influencia efectiva en la mente del jurado sobre aquel cuidado y sospecha ordinarias que naturalmente se manifestarían por tales imputaciones; y la regla tiende pues a convertirse en la práctica meramente, en un medio de obtener del juez sentenciador la expresión de una forma de palabras que pueda resultar errónea y servir de base para un nuevo juicio. Finalmente, el propósito de la regla se alcanza enteramente por el poder que tiene el juez de anular un veredicto basado en prueba insuficiente, y de acuerdo con este poder los veredictos constantemente se anulan, en jurisdicciones que no tienen ninguna regla estatutoria por la misma prueba que en otras jurisdicciones sería insuficiente bajo la regla estatutoria que requiere la corroboración.

"Sin embargo, en muchas jurisdicciones un estatuto que se basa en un fin plausible pero discutible de proteger contra una falsa acusación, ha introducido una regla que requiere la corroboración." 3 *Wigmore* sobre Evidencia, pág. 2757, sección 2061.

"Tres formas de conducta más o menos definidas por parte del demandado pueden descubrirse de las autoridades: primera, las pro-

mesas falsas y artificios; segunda, la incitación e importunidad; tercera, el enamorar a la mujer creando en ella un deseo de relaciones impropias. Si bien las tres a menudo concurren y no pueden ser distinguidas claramente, cualquiera de los tres elementos parece ser suficiente para sostener la acción. Por ejemplo se permitió a la mujer recobrar cuando el demandado, que era un hombre de posición y de edad, visitaba a una joven casta, su empleada, después de anochecer, le mostraba su afecto, frecuentemente la acariciaba, hacía promesas de futura amistad y adhesión y finalmente la sedujo. Si bien la corte declaró que algo más que la mera repulsión por parte de la mujer era necesaria y que debe aparecer que se obtuvo su consentimiento mediante halagos, falsas promesas, artificio e importunidad insistente, fundados en profesiones de afecto o cosas semejantes y que confiando únicamente en tales halagos, falsas promesas, artificio e importunidad, es que la mujer debió haber entregado su persona al demandado, un veredicto a favor del demandante no sería alterado. La repulsión de la mujer en realizar el acto debe ser tal que las incitaciones y persuasiones no puedan vencer, sin la presencia de alguna otra influencia poderosa; debe probarse un estado tal de cosas que convenza a una persona de inteligencia razonable de que ella había sido engañada, y que su sumisión fué debido a tal engaño e ilusión. La persuasión e incitación han sido reconocidas como suficientes para imputar responsabilidad al demandado, sin ningún elemento de engaño, cuando la acción se establece por la mujer, así como en las acciones seguidas por cualquiera de los padres. De manera que en una acción por seducción la prueba de que el demandado llevó a la demandante, una joven de 16 años, que vivía con sus padres y hasta entonces tenida por casta, a un baile a cierta distancia de su casa, y a su llegada él solicitó una habitación con el propósito expreso de realizar actos carnales con ella, dando inmediatamente comienzo a sus fines indecentes; que tarde en la noche salieron ellos del salón de baile y fueron al dormitorio a instancias del demandado, donde realizó él su propósito, se declaró que era un caso propio para ser sometido al jurado. Así también en una acción seguida por el padre se resolvió que el demandante no tenía necesidad de probar que el demandado se había valido de halagos o falsas promesas para con su hija, sino que sería bastante si la seducción era consecuencia de la incitación e importunidad del demandado hacia la hija para consentir en el contacto carnal y que debido a esto ella lo toleró. Los amoríos que traen por consecuqencia una seducción han sido reportados en varios casos. Así, pues, en una

acción seguida por el padre, las atenciones continuadas por varios meses, seguidas del trato carnal, se ha declarado que sostienen la inferencia de seducción. También en acciones seguidas por la mujer seducida esta clase de conducta se ha sostenido que es suficiente para fundar la acción. Así, cuando un hombre casado, de 42 años de edad, tuvo contacto carnal con su sirvienta, que era una muchacha de 15 años, después de continuos y diarios amoríos por algunos meses, se resolvió en una acción por seducción, que si los medios empleados por el hombre tenían por fin vencer la voluntad de una muchacha de esa edad y experiencia y se proponían crear en su ánimo un afecto hacia él, y realmente ese fué el resultado, y bajo esa influencia ella se entregó a él, esto equivalía a un artificio dentro del significado de la ley y la suficiencia de la prueba para establecer ese hecho y constituir seducción era cuestión del jurado. Igualmente cuando un hombre decía a una muchacha de 17 años de edad que él la quería más que a ninguna otra que hubiese conocido, que nunca le pesaría ni lo sentiría jamás, y que siempre podría vivir con él y ser feliz, se resolvió que puede hacérsele responsable por seducción con arreglo a un estatuto que establece la responsabilidad por seducción bajo tal 'promesa, artificio como el que puede vencer los escrúpulos de una mujer casta.' * * * Finalmente, debe admitirse que no se ha adoptado ninguna norma satisfactoria para determinar qué artes y promesas son suficientes para constituir seducción. Cada caso debe subsistir por virtud de sus propios hechos. Ningunas artimañas o promesas particulares constituirán, como cuestión legal, el delito de modo que pueda la mujer establecer una acción. Es generalmente una cuestión para resolverla el jurado mediante la debida instrucción dada por la corte.

"Aunque la promesa de matrimonio es uno de los medios a que a menudo recurre el seductor para realizar su propósito, tal promesa no es un elemento necesario en la seducción. Ciertamente que ciertas autoridades no admitirán prueba de la promesa de matrimonio en una acción de seducción seguida por uno de los padres, si bien hay conflicto de autoridades sobre este punto. ·Por el hecho de que no es necesaria la promesa de matrimonio, un hombre casado puede ser culpable de seducción, aun cuando la mujer supiera que era casado."

24 R. C. L., pág. 734, secciones 5 y 6.

En vista de la interpretación que dió la corte sentenciadora a la declaración de la demandante, trascribimos sus

manifestaciones al pie de la letra, según aparecen de los autos, a saber:

"La testigo Angela López bajo juramento declara: que ese es su nombre; que es vecina de San Juan desde hace 4 años; que en el año 1915 vino a San Juan; que conoce a Don Emilio Chevremont desde el 1916, con motivo de que estando en la Caleta de San Juan No. 19, en casa de la señora Emilia Llano, le dolía mucho la boca y preguntó por un dentista y le dijeron de él, y un día a eso de las dos de la tarde se dirigió a su casa, fué allá y entró, y le manifestó que le dolía mucho la boca y que iba a extraerse una muela; que le dijo que esperara, y terminando el que estaba en el asiento la llamó y le dijo que tenía la boca muy enferma, que iba a extraerle la muela, y que tenía que seguir yendo allá; que le sacó la muela, le pagó y se marchó a su casa, y a los dos o tres días sintió que la boca le dolía muchísimo, fué otra vez porque le dijeron que podía tener una infección; que él le dijo que siguiera yendo a curarse la boca, a sacarse las muelas, y que estuvo yendo como un mes; que al mes de estar yendo allá él comenzó a hacerle preguntas indirectas, averiguando; que le preguntó en dónde vivía, que quién era, que como se llamaba, que de quién tenía luto y después se dirigió a ella enamorándola, diciéndola, que le gustaba mucho, que porqué no lo quería, que si ella tenía novio, que él era sólo, que ella le dijo que nó porque él era un señor casado y le contestó que no importaba, que él era casado pero que tenía la demanda de divorcio puesta y tan pronto se divorciara podía casarse con ella, y podría comprarle una casa y se la amueblaría; que cada vez que iba siempre le decía, y estuvo como por espacio de dos o tres meses en eso; que un día le dijo a ella que buscara una casa y la alquilara; que él la iba a amueblar para que se fuera a vivir con él, que él la quería mucho, que se quedara que haría por ella, que no la olvidaría nunca, y ella le dijo que no quería hacer eso, que no se atrevía, y entonces él le dijo que en los altos de su oficina había un mirador, que podía alquilarlo para que se fuera a vivir; que en eso la dijo que fuera un día a ver ese mirador y ella nunca se dispuso a ir, pero que una noche salió de su casa a la botica y lo encontró parado en la puerta del zaguán, la llamó y le dijo que entrara a ver el mirador, y que ella le dijo que no se atrevía, y él insistía en que entrara y la dijo que no la iba a pasar nada, que entonces entró y la dijo que se quedara allí dos o tres horas con él, que no la iba a pasar nada y que en todo caso él se hacía responsable, que él la quería, y que como él

insistió se quedó ella allí con él; que eso sería como a las ocho y media de la noche; que se quedó allí, que estuvieron hablando como media hora desde que él la llamó hasta que la hizo subir; que subió y que él la llevó al mirador; que él entró al mirador; que en el mirador no había nada más que dos camas; que ella le dijo entonces que si esa era la casa, que le faltaban muebles que porqué la había llevado a aquella casa que estaba en esas condiciones; que él la contestó que como hacía poco tiempo que la había cogido que por eso la tenía así, que no había tenido tiempo y que estaba enfermo; que después pasó, que él llevaba una botella en las manos, la destapó, tomó y la dió a tomar a ella y la dijo que se quedase allí; que ella estaba sentada en la cama y se puso donde ella estaba y la echó el brazo por el cuello y tocándola la decía que se quedara allí, que no le pasaría nada, que él se hacía responsable que si no lo quería, que si no le había dicho que lo quería, que podía quedarse en confianza; que ella era pobre y que iba a encontrar su felicidad con él, que lo quisiera y que él no la abandonaba, que no recuerda bien lo que le dió a tomar, * * * que cree que sería ron o brandy lo que tomó él y le dió a tomar a ella; que después él se sentó en la cama con ella, se sentó en la cama, la echó el brazo por el cuello, la cogió las manos, y la decía que si la quería; que él no le hizo nada más; que él la dijo que porqué no se entregaba a él, que si ella no lo quería, que aquella era la casa de ella, que si no quería aquella que buscara otra donde quisiera, y como le dijo eso entonces se entregó a él; que él la desvistió; que las puertas estaban cerradas; que se acostó con ella, que ella no se desvistió, sino que él la desvistió; que entonces él nada hizo con ella, se acostó con ella, que no le hizo nada más, que allí no ocurrió nada más, que se acostó con ella, que con ella hizo que la besó, la abrazó * * * que no la hizo nada más; que nada más; que se acostó con ella; que tuvieron actos carnales; que tuvieron esos actos carnales esa noche; que después salió ella de allí como a las diez o diez y media; que cuando terminaron la dijo que volviera por allá lo más pronto posible y la llevó hasta el zaguán— que desde esa noche estuvo enferma como quince días; que a los quince días volvió a ir; que a consecuencia de eso fué que estuvo enferma como quince días, que a consecuencia de lo que había sucedido con él; que estuvo como quince días así enferma; que volvió donde él a ver en que quedaban y él la dijo que porqué no había ido que qué la había pasado y que ella le dijo que estaba enferma y él la dijo que tenía muchos deseos de verla, que no hiciera eso, que le hubiera mandado una razón, y comenzó otra vez con las mismas

cosas, que la quería, que se quedara allí, que qué iba a determinar; y que entonces ella volvió a quedarse allí con él; que él la acariciaba en esos momentos; que la tocaba; que después de toda esa escena, la bajaba otra vez; que sí señor que iban al cuarto otra vez al mirador antes de bajarla; que sí señor que allí tenían otra vez actos carnales; que cree que esas escenas se llevaban a efecto como por dos meses; que la época sería como de noviembre a enero; noviembre del año 1916 a enero del 1917; que con motivo de esos actos salió encinta; que ella le comunicó al señor Chevremont que estaba encinta; que él comenzó entonces a decirle que no podía ser, que no lo creía, y ella siempre se lo decía y él decía que no, que no podía ser, que no estaba encinta nada, y un día le dijo que si estaba encinta no sería el niño de él; que él no continuó entonces tratándola con la misma dulzura y cariño que antes; que entonces no siguió haciéndola los ofrecimientos aquellos; que durante tuvo esas relaciones con él él no le daba dinero ni le hacía regalos; pero él se conducía bien con ella en esa época; que de los trabajos que él le hizo a ella en la boca le cobró la primera vez y la segunda, y después le dijo que no, que después no la cobraba nada por el trabajo; que dió a luz a los nueve meses; a los nueve meses de tener los actos carnales con él; que él la ayudó, pues ella le avisó a él que iba a dar a luz; que no la dijo nada, sino que mandara por allá a buscar dinero; que ella mandó; que él la mandó dos o tres veces, pero que no puede recordar la cantidad que la mandó; que el dinero que la mandó le sirvió para ayudar a pagar sus gastos en todo; que si él no la hubiera hecho todos los ofrecimientos que le hizo no se hubiera entregado a él; porque no tenía una necesidad; que ella se le entregó porque creyó en las ofertas y en todo lo que él la decía; que después de ella haber dado a luz la niñita, fué donde él; a buscar dinero; que unas veces le daba y otras no; que ella le decía para que era el dinero—que era para los gastos de la niña—que le daba algunas veces; pero que en una ocasión no le quería dar nada, y en vista de que no le daba nada ella vino a la Corte a demandarlo donde el fiscal; que ella le contó todo lo que le había pasado con el demandado; que como resultado de lo que ella le dijo al fiscal se puso la demanda y vinieron a la fiscalía, y ella no sabe lo que él dijo; a las preguntas que se le hacen de si sabe lo que es una demanda, que si es una denuncia o una queja contesta que primero vino a dar la queja y después se puso la denuncia; que sí señor que ella juró en esa denuncia o queja; que como resultado de esa queja el señor Chevremont por medio del abogado de él señor Méndez Vaz la llamó

y le dijo que retirara la denuncia, pues Chevremont se comprometía
a darle $12 a la niña mensuales; que ella se conformó con los doce
dollars, porque no quería dar escándalo, no tenía mayormente tes-
tigos, estaba enferma y se conformó con eso; que Chevremont le
está pasando ahora doce dollars mensuales; que siempre ha ido a
a buscar los doce dollars mensuales; que se los entregan; que ella
dá recibo por ellos; que los doce dollars son para alimentos de la
niña; que para ella no le dá nada; que no recuerda bien cuanto
tiempo hace que le están pasando esos doce dollars; que todavía
se los están pasando; a la pregunta que se le hace de si el señor
Chevremont alguna vez ha querido hacerse cargo de la niña, con-
testa que el abogado Méndez Vaz le traía razones a ella, y la decía
que Chevremont había dicho que la cogía; que le llevara la niña
que Chevremont la recibía, que él había dicho que la quería, para
educarla y quedarse con ella; que le decía que la iba a tener en
la casa de la familia de él de las hermanas; que no se la entregó
porque no hacía confianza en él para entregársela; que ella tiene
de diez y nueve a veinte años; que ella nació en Mayagüez; que no
está segura de si la registraron en el Registro Civil; que sabe que
se han hecho gestiones para encontrar su partida de nacimiento; que
no se ha encontrado; que no sabe porqué no está en el Registro Civil;
que cree en la edad que tiene por lo que dicen las personas que la
conocen y por lo que le decía su papá.    El demandado se opone por
ser de referencia, y el juez sostiene la oposición; que su papá no
vive; que ha dicho que no aparece inscrita en el Registro Civil; que
tiene veinte años; que cuando le ocurrió el hecho tenía diez y seis
o diez y siete años; que ella lo sabe.

    *    *    *    *    *    *    *

"* * * que ella creía que el señor Chevremont estaba en
condiciones de cumplirles todos los ofrecimientos que le había hecho;
que ella le creía porque él se lo decía y además ella oía decir que
él era un hombre rico, que debido a la postura de su casa y a las
condiciones de su casa creía que era un hombre rico, que le iba a
comprar la casa, que la iba a hacer feliz y todo eso y que se iba
a casar con ella después de divorciado; que Chevremont no es un
hombre joven; que es un hombre de más edad que ella; que cree
que tenga doble edad que ella; que ella le creía a él entonces bajo
esas condiciones; que él ejerce su profesión; que su profesión es
dentista; que la ejerce en San Juan; que la declarante es huérfana;
que su padre murió y su madre también; que su madre murió en
el 5 y su papá en el 16; que ella vino a San Juan en el 1915; que

es pobre; que en la época que le ocurrió eso también era pobre. La testigo a preguntas del demandado declara que ella dijo que conoció al señor Chevremont porque fué a arreglarse la boca a su casa; que está segura de eso de que fué la primera vez; que con anterioridad al arreglo de la boca no había estado de criada en la casa del señor Chevremont.

\*          \*          \*          \*          \*          \*          \*

"Continúa la testigo declarando a preguntas del demandado, que no había estado al servicio de la familia Chevremont; que no recuerda haber estado al servicio o haber vivido alguna temporada en la calle de San Francisco 72, en casa de don Emilio Chevremont, que desde que está en San Juan en la única parte que ha vivido antes de haberle sucedido eso fué en casa de doña Emilia Llano; que no conoce a doña Emma Hernáiz esposa de Chevremont.

\*          \*          \*          \*          \*          \*          \*

"Que Chevremont tenía la oficina en la calle de San Francisco esquina a Cruz; que sí señor al lado de la Notaría de don Damián Monserrat; que sí estuvo diferentes veces a arreglarse la boca; que sí el señor Chevremont la requirió de amores; que sí dijo que una noche a las ocho de la noche estuvo allí; que nadie había en el mirador del señor Chevremont; que estaban los dos sólos; que el día que subieron al mirador le había dicho a él que lo quería; que estuvieron allí hasta las diez y media u once de la noche."

El juez de distrito no hace ninguna mención de la prueba en cuanto al previo buen carácter y conducta ejemplar de la demandante. El párrafo inicial de que existió ausencia completa de prueba, por lo menos no es compatible con el comentario que sigue, el cual al tratar de señalar los elementos esenciales que no han sido establecidos, no sólo revela una idea errónea de la supuesta necesidad de una promesa de matrimonio y de que es necesaria la corroboración, sino que también indica que las admisiones y alegaciones terminantes de la contestación fueron enteramente desatendidas.

Sin duda que las cortes deben ser cuidadosas en casos de esta naturaleza y la prueba ha de ser clara y convincente; pero esto no quiere decir que el demandante deberá presentar testigos oculares en cuanto a los medios empleados por el demandado para llevar a cabo su propósito. Los jueces,

en su celo por proteger los derechos de los hombres honrados deben recordar que la regla en cuestión no se estableció para favorecer la evasión de truhanes sin escrúpulos, y que una demandante honrada tiene también ciertos derechos. De otro modo, el estatuto arriba citado en primer término se convertiría en letra muerta y la clase para cuyo beneficio se decretó la ley quedaría sin un remedio contra uno de los más crueles males que pueden causarse a una mujer.·

Desde luego que nada de lo aquí expresado deberá interpretarse en el sentido de que indica una opinión sobre los méritos del caso que puedan desarrollarse de toda la prueba de ambas partes. Pero, como ya se ha dicho, para los fines de un sobreseimiento (*nonsuit*) debemos tomar la prueba de la demandante como verdadera. Considerada de tal modo, la prueba es clara y convincente y no proporciona base razonable alguna para la conclusión a que llegó la corte inferior.

El demandado no dijo rotundamente a la demandante·: ''Si usted quiere ser mi mujer yo le proporcionaré una casa y alimentos y la vestiré así como le facilitaré dinero para afrontar sus necesidades razonables y nunca la abandonaré.'' Aún implicando esa falsa promesa, como implica, por lo menos la apariencia de un hogar permanente con los medios de subsistencia, y tal vez algunas de las comodidades de la vida, si la hace un hombre ya de edad y de recursos al oído de una· inocente huérfana sin recursos podría ser bastante para sostener una acción. Pero no es eso todo. Se trata aquí de una muchacha de 16 años acostumbrada ya a la conversación del demandado y al contacto físico de sus manos como profesional por las visitas que hiciera a su oficina como cliente y por un período de un mes o más. En el curso de estas visitas tienen lugar preguntas cariñosas hechas a la demandante seguidas de demostraciones de afecto y cariño, mediante las promesas de un amante que hace el papel de ''casado pero sin congeniar con la esposa,'' está para divorciarse

y que después estará libre para casarse con la demandante. Y esto continúa por varios meses. El ofrecimiento de una casa amueblada y las invitaciones a subir al mirador que está sobre la oficina, al principio fueron rechazadas, pero el demandado persiste en su importunidad. Finalmente logra inducir a la demandante a entrar al mirador después de repetidas promesas de que nada le sucedería y la visita se prolonga por las nuevas promesas de igual clase hechas con el sólo objeto de alejar cualquier sospecha que la demandante hubiera podido tener, o que al parecer tuvo, de una intención engañosa. Luego se sirven bebidas. Se reanudan los halagos acompañados ahora de caricias. El aliciente ya no es, si lo fué, el mero pago del alquiler de una casa, sino una visión de futura felicidad en tan marcado contraste con las condiciones existentes que las manifestaciones de simpatías por esta situación sin duda eran supérfluas como delicado recordatorio a la demandante. Puede ser que la prueba de la defensa dé un aspecto distinto al caso al ser sometido finalmente a la decisión de la corte por sus méritos. Pero tal como ahora se presenta el caso no podemos convenir con el criterio que tuvo la corte inferior al resolver la moción de *nonsuit*.

La apelante también impugna la orden desestimando la moción que presentó para que se hiciera más específica, entre otros particulares, un párrafo de la contestación, el cual es como sigue:

"Niega el demandado de propio conocimiento que en el mes de diciembre de 1916 y dos años antes fuese la demandante una mujer casta, virgen y pura; y afirma, de contrario, que para esas fechas fué conocida viviendo públicamente en concubinato en Mayagüez primero en una casa de la calle de Méndez Vigo, hoy Hostos, y posteriormente en el barrio de Guanajibo, de dicha municipalidad, según una información que el demandado cree cierta."

Nos inclinamos al parecer de que la demandante tenía derecho a que se hiciera una alegación más específica en este

respecto; pero no citándose ninguna autoridad en apoyo de la alegación y toda vez que las partes tendrán oportunidad de volver a presentar la misma cuestión y tal vez más ampliamente a la consideración de la corte de distrito, no es necesario resolver ahora el punto.

La sentencia recurrida debe revocarse y devolverse el caso para ulteriores procedimientos que no sean incompatibles con esta opinión.

> *Revocada la sentencia apelada y devuelto el caso para ulteriores procedimientos.*

Jueces concurrentes: Sres. Presidente del Toro y Asociado Wolf.

Los Jueces Asociados Sres. Aldrey y Franco Soto disintieron.