IRENE APONTE Y FONTÁNEZ, menor representada por su padre José Aponte, demandante apelante, *v.* RAMÓN ALONSO MUÑOZ, demandado apelado.

No. 6355.—*Sometido:* Abril 12, 1934. *Resuelto:* Abril 20, 1934.

_Angel A. Vázquez,_ abogado de la apelante; _Cayetano Coll y Cuchí, V. A. Coll, Diego O. Marrero y Guillermo Silva,_ abogados del apelado.

EL JUEZ ASOCIADO SEÑOR CÓRDOVA DÁVILA, emitió la opinión del tribunal.

Irene Aponte y Fontánez, menor de edad representada por su padre José Aponte, ejercita esta acción en reclamación de daños y perjuicios contra Ramón Alonso Muñoz, a quien acusa de haberla persuadido a mantener comercio carnal ilícito con ella bajo promesa de matrimonio. Se alega en la demanda que en marzo de 1931, la demandante gozaba de magnífica reputación moral y social, siendo una mujer soltera, honesta, casta y virtuosa y reputada hasta entonces como pura; y que desde hacía como dos años, con anterioridad a dicha fecha, llevaba y venía llevando lícitas y públicas relaciones amorosas, para casarse, con el demandado Ramón Alonso Muñoz, hombre soltero y con el cual podía contraer matrimonio sin dispensa alguna; que a principio de marzo de 1931, el demandado sedujo a la demandante, bajo promesa

de inmediato matrimonio, teniendo comercio carnal ilícito con ella y gozando de su virginidad, en el barrio de Monacillos de Río Piedras; que la demandante realizó el acto carnal con el demandado y le rindió su virginidad, como consecuencia única y exclusiva de la promesa de matrimonio que le hizo el referido Ramón Alonso Muñoz; que el demandado no ha cumplido ni está dispuesto a cumplir la promesa de matrimonio que hizo a la demandante. Se alega, además, que la demandante ha perdido la buena reputación moral y social de que gozaba en la comunidad, ha sufrido y sufre enfermedades, insomnios, decaimiento orgánico y dolores morales por la pérdida de su virginidad, pureza y reputación; que se encuentra avergonzada por el ultraje inferídole en su honor por el demandado, y que se encuentra impedida, por falta de su virginidad, de contraer matrimonio con cualquier otro hombre y está expuesta, por culpa del demandado, a futuras desdichas que nada bueno le proporcionarán. La demandante reclama $20,000 por los daños y perjuicios que, según alega, se le han ocasionado.

El demandado niega, por carecer de información y creencia suficientes para admitirlo, que la demandante, en la fecha que se fija en la demanda, gozara de magnífica reputación moral y social, o fuera una mujer soltera, honesta, casta, virtuosa y reputada hasta entonces por pura. Niega, además, que llevara relaciones lícitas y públicas con la demandante ni que le ofreciera en ocasiones algunas contraer matrimonio con ella, ni que a principios de marzo de 1931, ni en ninguna otra fecha, sedujese a la demandante bajo promesa inmediata de matrimonio, y asimismo niega que tuviera comercio carnal ilícito con ella y que gozara de su virginidad en el barrio de Monacillos de Río Piedras, ni en ningún otro momento o sitio. En el hecho cuarto de la contestación, el demandado repite su negativa de haber realizado actos carnales con la demandante en la forma alegada ni en ninguna otra forma.

Tanto la demanda como la contestación aparecen juradas;

la primera, por el padre de la menor demandante, José Aponte, y la segunda, por el propio demandado, Ramón Alonso Muñoz.

Con excepción de la certificación de nacimiento de la demandante, quien según la misma, nació en 28 de marzo de 1916, la evidencia producida es toda testifical. La corte inferior dictó sentencia declarando sin lugar la demanda. El recurso de apelación interpuesto por la demandante se basa única y exclusivamente en que el fallo se debió a una errónea apreciación de la prueba. La corte inferior, en el examen que hace de las declaraciones de los testigos, pone en tela de juicio el testimonio de la demandante, de cuya veracidad duda, y, haciendo constar que la prueba es contradictoria, resuelve el caso en favor de la parte demandada. Toda vez que el recurso interpuesto se limita a plantear y discutir cuestiones de hecho, se hace necesario conocer y analizar la prueba para ver si la corte inferior ha incurrido o no en el error que se le atribuye, y si este error, en caso de que exista, es de tal naturaleza que justifique la revocación de la sentencia.

La joven Irene Aponte declara lo siguiente a preguntas de su abogado:

"Me llamo Irene Aponte: conozco a Ramón Alonso Muñoz, que está aquí al lado de su abogado, Sr. Coll, quien era novio mío con promesa hecha a mí y a mi madre de casarse conmigo y con quien llevé relaciones amorosas durante dos años. Lo conocí en casa de su mayordomo Eleodoro Torres, en el barrio Monacillos, No. 6, de Río Piedras cuya casa quedaba en la finca de Ramón Alonso, cerca de la en que yo vivía de don Jorge Romaní: ambas fincas quedaban frente por frente: Yo hablaba con Alonso algunas veces en la casa de Eleodoro Torres y otras veces en la casa que Alonso tenía en su finca frente a la vía. Durante mis relaciones amorosas con Alonso éste me decía que me fuera con él, que se casaría conmigo y yo le dije que no me atrevía, que se lo dijera a mamá y él me decía que hablaría con ésta. Empecé a llevar relaciones con Alonso en el año 1929 y viví en el barrio Monacillos con mi familia hasta el mes de agosto de 1930 en que nos trasladamos para el barrio de Hato Rey, en cuya época continuaba todavía Ramón Alonso las relaciones amoro-

sas conmigo. Alonso iba a mi casa y me visitaba y me llevaba a pasear en su auto, unas veces me iba a buscar por la mañana pero siempre me iba a buscar por la noche. A los paseos íbamos como novios. En uno de esos paseos me llevó a la casita que él tiene en la finca, a la orilla de la vía, en el barrio Monacillos, en el automóvil y me dijo allí que si yo me entregaba a él, se casaría conmigo y tanto estuvo diciéndomelo hasta que me obligó a entregarme a él y allí gozó de mi virginidad y yaciendo conmigo. En ese momento yo tenía como catorce años de edad y era virgen. Yo nunca había tenido otro novio nada más que Alonso y cuando comencé las relaciones amorosas con él sólo tenía trece años de edad y no había tenido ningún novio. Alonso gozó de mi virginidad en el mes de marzo de 1931 y yo no había salido a pasear con ningún otro hombre más que con Alonso y le entregué mi virginidad porque en ese momento él me repitió que se iba a casar conmigo en esa semana porque esperaba arreglar unas cosas para casarse. Después de ese día en que Alonso gozó de mi virginidad continué yendo con él a esa misma casita como tres o cuatro meses más, pues él siempre me iba a buscar en automóvil y allí en la casita realizábamos contacto carnal repitiéndome siempre que se casaría conmigo. Alonso no se ha casado conmigo pero me decía siempre que se casaría. Después él se fué y no volvió más donde mi y entonces mamá, papá y yo fuimos donde él, y yo le dije que lo iba a denunciar y él me dijo 'tumba eso que tú cada vez que vienes no vienes más que a molestarme', y lo denuncié. Después que él me abandonó en esa forma he sufrido muchísimo, estuve enferma mucho tiempo, hay veces que no puedo dormir tranquila y fuí despedida de la congregación 'Hijas de María', a la cual yo pertenecía porque el Padre (Sacerdote) supo que yo no era señorita, y me sacó de la congregación, porque no podía estar junta con las otras niñas.''

## A preguntas del demandado, contestó:

''Yo he puesto este pleito porque Alonso me ofreció casarse conmigo. A pesar de que Alonso, en el momento antes de gozar de mi virginidad me ofreció casarse a la semana siguiente, yo continué yendo con él durante tres meses más a tener actos carnales en la casita porque él me iba aplazando, ofreciéndome siempre casarse conmigo y a lo último fué que cogió y se fué y no volvió más. Cuando Alonso me conoció yo vivía en el barrio Monacillos con mis padres y Alonso tenía una finca frente por frente a la en que vivían mis padres. Allí todo el mundo decía que Alonso tenía dinero y yo le creí cuando

por primera vez me dijo que se iba a casar conmigo y no sabía si él me estaba engañando o no, pues no pensé que me iba a engañar. Él me decía que se iba a casar conmigo. Yo estuve como tres años viviendo frente a la finca de Alonso y después nos mudamos para Hato Rey y ahora vivimos en el campo. En Hato Rey vivimos como un año o nueve meses toda mi familia y yo, que trabajo en mi casa atendiendo a los oficios de ésta. Con el único que salía en automóvil era con Alonso nada más. Nunca he estado enferma en el hospital. Los únicos médicos que me han tratado son el Dr. Moczó y el Dr. Mercado, El Dr. Moczó me asistía de un dolor que me da cuando voy a caer con la regla y la primera vez que el Dr. Moczó me asistió de ese dolor era yo virgen, como tres meses antes de entregarme a Alonso y la última vez que me recetó fué en marzo de 1931, como dos semanas después de haberme entregado a Alonso: dos semanas después de haberme entregado a Alonso fuí donde el Dr. Moczó para que me recetara para ese dolor y le dije que había sido deshonrada: de noche no duermo pensando en el engaño que me ha hecho Alonso: nunca he ido al cine, ni al Parque Muñoz Rivera: siempre estoy en mi casa trabajando: cuando salí de mi casa en automóvil con Alonso para ir a Monacillo yo no sabía que Alonso iba a pretender que yo me le entregara: en tres horas hicimos el viaje, venció él mi resistencia y yo me le entregué.''

Filomena Fontánez, madre de la demandante, respondiendo al interrogatorio directo, se expresa así:

''Me llamo Filomena Fontánez. Irene Aponte es mi hija. Conozco a Ramón Alonso Muñoz, que está aquí (señalándolo). En el año 1929 mi familia y yo vivíamos frente a la finca de Aloñso, donde le llamaban el No. 6, al pie de la casilla y la finca en que vivíamos era de don Jorge Romaní, cuya finca queda frente a la de Ramón Alonso. Por ese año 1929 hablé con Alonso, pues le llamé porque llevaba amores ocultos con mi hija Irene y entonces él me dijo que le gustaba la muchacha y que quería llevar relaciones amorosas con ella, contestándole yo que hablara con el padre de la muchacha porque yo era la madre y no podía resolver sobre eso, que eran cuestiones del papá: entonces Alonso me dijo que si yo quería él llevaba relaciones con Irene y que si no quería también las llevaba. En esa época el padre de Irene estaba en el hospital y Alonso iba a casa a menudo, tres días en semana, por la noche, y como Alonso me estaba una persona seria lo dejaba que visitara a mi hija. Alonso me dijo que quería llevar relaciones con mi hija para casarse y yo le dije

que mi hija era pura y que no era para ser una desgraciada pues tenía 13 años entrados en 14.

"Cuando él me dijo que quería llevar relaciones con mi hija con ideas de casarse, le advertí que ella era una niña pobre. Él la iba a buscar a menudo para pasear en automóvil y salía con él y éste la traía a casa. En agosto de 1930 nos mudamos para Hato Rey y entonces Alonso iba a visitar con más frecuencia a mi hija porque vivíamos en el pueblo y diariamente llevaba a pasear a mi hija. En el mes de marzo de 1931, viviendo nosotros en Hato Rey, Alonso se llevó a mi hija a las 9 de la mañana y la trajo a casa al mediodía, porque la había llevado Alonso a una casita que tenía en su finca. Al contarme mi hija lo que le había pasado con Alonso, salimos en busca de éste y lo encontramos en la carretera y cuando yo me puse a hablar con él me dijo que no lo denunciara que él se casaría con ella. Mi hija no había tenido ningún otro novio y llevaba relaciones con Alonso desde la edad de 13 años. No salía con nadie y a mi casa no iba nadie más que Alonso."

Repreguntada por el demandado, contestó:

"El día en que Alonso se llevó a las 9 de la mañana a mi hija y no volvió hasta las 12 del día con ella, me llevó un litro de leche. Ese día yo no hablé con mi hija. Nosotros tratábamos a Alonso como una persona de confianza, pues como era novio de mi hija y eso era público todo el mundo conocía esas relaciones. Cuando Alonso iba a buscar a mi hija en automóvil siempre iba solo y solo salía con ella y nosotros la dejábamos ir, porque eran novios. Mi hija me comunicó lo que le había ocurrido con Alonso a los tres meses de haberle sucedido eso. Irene vive con nosotros, nunca sale ni tiene amigos, y si sale, sale conmigo y yo la dejaba salir con Alonso porque era su novio y se trataba de una persona seria."

José Aponte, padre de la demandante, interrogado directamente, contestó:

"Me llamo José Aponte, soy padre de Irene Aponte, conozco a Ramón Alonso Muñoz, que está ahí sentado (señalándolo). En el año 1929 estuve tres meses recluído en el Hospital Municipal. En ese año Alonso iba diariamente a casa a visitar a mi hija y yo le llamé la atención y le pregunté con qué objeto visitaba mi casa y entonces me hizo saber que llevaba relaciones amorosas con Irene y me dijo que era con el fin de casarse con ella, con lo cual yo estuve con-

forme pero le dije que en esa época él no podía casarse con la niña porque sólo tenía unos trece años cumplidos. En el año 1930 me trasladé con mi familia a vivir a Hato Rey y allí él iba diariamente a visitar a mi hija. En uno de los días del mes de marzo de 1931 Alonso fué a casa a buscar a Irene y se la llevó al campo del barrio Monacillos y allí la deshonró, gozando de su virginidad. Después de Alonso haber deshonrado a mi hija Irene lo llamamos para hablar con él y él me dijo que se casaría con Irene pero que tuviéramos un poquito de calma, y admitió que la había deshonrado. Yo le había dado permiso a Alonso para que fuera a mi casa a visitar a Irene y él la llevaba a pasear todos los días, en automóvil. Irene no ha tenido ningún otro novio que no fuera el señor Alonso, pues ella era muy niña cuando empezó las relaciones amorosas con él.''

Eleodoro Torres, a preguntas del abogado de la demandante, contestó:

''Me llamó Eleodoro Torres, conozco a Irene Aponte, que está aquí entre nosotros y conozco también a Ramón Alonso Muñoz que está allí (señalándolo). En el año 1929 yo vivía en el barrio Monacillo de Río Piedras en una finca del señor Alonso, en donde yo trabajaba como mayordomo. A menudo salía yo con Alonso a voltear la finca y nos encontramos por allí con Irene. Ella venía también por mi casa, pues éramos vecinos. Irene y Alonso eran novios y no sólo lo sabía yo personalmente sino que también era público y todo el mundo lo veía a él que diariamente visitaba la casa de Irene. El la iba a buscar a pasear y la traía algunos días a la misma finca de la cual era yo mayordomo y al lado de un establecimiento que en la finca se dedicaba a lechería, Alonso tenía una casita y allí se iban los dos, estaban un rato y después él la llevaba a su casa. En la época en que Alonso e Irene llevaban sus relaciones amorosas, la reputación de Irene en aquella comunidad era muy buena. La familia de Irene y la mía se visitaban con frecuencia y yo iba con frecuencia a la casa de ella. Cuando yo llegué a vivir a esa finca a la primera gente que conocí fué a esta niña Irene y a su familia. Yo soy casado y mi familia y yo tratamos a Irene y a su familia durante más de dos años y medio, en que fuimos vecinos y durante esa época la reputación de Irene era magnífica y era una niña que se ocupaba de los quehaceres de la casa. Cuando ella salía con el único hombre que iba y llegaba a mi casa era con Alonso. Irene era una niña que entonces tendría como 13 ó 14 años.''

## A preguntas del demandado contestó:

"Yo me mudé del barrio Monacillos antes que Irene y su familia se fueron de allí; pero en el mismo mes se mudaron ellos también. Después que me mudé no había vuelto a saber más de Irene. Yo salí de buenas de la finca del señor Alonso y el día que yo salí de la finca Alonso mismo me dió un carro y bueyes para la mudanza."

## El Doctor Luis R. Moczó declara lo siguiente:

"Me llamo Luis R. Moczó, soy médico cirujano y ejerzo mi profesión hace seis años. Conozco a Irene Aponte la joven que está sentada allí (señalándola) y la he tratado, como médico, en varias ocasiones de unos dolores pélvicos que se presentan por lo regular al tiempo de la menstruación y a cuyos dolores se les llama vulgarmente 'dolor de hijar'. Esos dolores se le presentaban a ella en el período de menstruación. La traté por primera vez a fines del año 1930, en que se me quejó de ese dolor, porque lo tenía muy fuerte. Le hice esa vez varias preguntas y en el transcurso de éstas me dijo toda la historia y su estado social y la receté y le dije que volviera dentro de un mes. Al cabo de un mes, o sea a fines de enero de 1931, volvió y me dijo que se había aliviado algo pero que todavía le persistían los dolores, entonces le cambié la medicina y le encarecía que volviera otra vez. En ese mes de enero de 1931 como en el anterior de diciembre de 1930 solamente le examiné el abdomen por encima. En febrero de 1931, cuando ella volvió y me dijo que le persistían los dolores, la examiné abdominalmente solamente y entonces le pedí que me permitiese hacerle un examen interno, pero como ella me dijo que era virgen yo le contesté que podía examinarle aun siendo virgen y le hice un examen rectal para cerciorarme si había alguna patología en los órganos de reproducción. De ese examen rectal pude llegar a la conclusión de que Irene Aponte era virgen todavía. Para el examen la puse en la mesa en la debida posición y me cercioré de que existía un himen más una apertura por la cual no cabía escasamente un lápiz, y entonces, para no hacerle daño me fuí por la vía rectal y la examiné y llegué a la conclusión de que en ese momento en que yo la examinaba en febrero era completamente virgen. Al mes siguiente, o sea a fines de marzo de 1931, volvió donde mí y se quejó de los dolores, pero entonces ya ella no era virgen y me contó lo que le había ocurrido para perder su virginidad. Comprobé que en ese momento no era virgen, pues la puse en la mesa, la examiné y noté que ya el himen que existía no era el mismo que existía en febrero, enero y diciembre anteriores . . ."

Así declaran los testigos de la parte demandante. Veamos ahora la prueba aportada por el demandado. Transcribimos a continuación la declaración del testigo Félix Rodríguez:

"Me llamo Félix Rodríguez, vivo en Santurce, conozco a la joven Irene Aponte, que está sentada allí (señalándola) y a quien conozco desde que era una niña y llevaba relaciones amorosas con Ramón Alonso Muñoz. En esa época en que Ramón Alonso Muñoz llevaba relaciones amorosas con Irene Aponte yo era empleado de Muñoz como *chauffeur* y lo llevaba a todas partes. Muchas veces llevaba al Sr. Muñoz y a Irene Aponte en el automóvil. Varias veces llevé a Muñoz a la casa de Irene a buscar a ésta para paseo y yo no me ocupaba de lo que ellos dos hablaban en el automóvil porque yo sólo iba pendiente del guía."

Entonces el Lic. Coll y Cuchí, abogado del demandado, hizo al testigo la siguiente pregunta:

"¿Usted me conoce a mí, usted me ha visto a mí aquí?

"R.—Sí, señor, le he visto en su oficina el día que ellos me hicieron un rancho y me quisieron llevar a su oficina; me ofrecieron cien pesos porque yo viniera a engañar a la corte, y el rancho no salió de ella, porque vinimos a ver al señor Ubarri, que era instructor de *jockeys*, y cuando yo vine a ver estábamos en la oficina de usted, que no salimos a la oficina de usted . . . Yo fuí a la oficina del abogado Sr. Coll engañado por Alonso y creyendo que íbamos a ver al instructor de *jockeys*, que vive en Cristo 4. Subí a la oficina del Sr. Coll y me llamaron a mí a un apartado al final de la casa donde estaba el Sr. Coll y éste me dijo que si yo podía servir de testigo al Sr. Alonso y yo le dije que no podía de ninguna manera, porque yo no venía a la corte a decir una mentira. Entonces el Sr. Coll me dijo que yo no servía. Allí me ofrecieron $100.00 y yo dije que no, porque no iba a engañar a la corte. El Sr. Coll sabe que yo no le acepté declarar aquí a favor del Sr. Alonso bajo ningún concepto."

A preguntas de la demandante, ocurrió lo siguiente con este testigo:

"P. ¿Quién fué el que le ofreció a usted la suma de cien pesos para que viniera a declarar?

"Sr. Coll: Yo me opongo a eso. Eso lo ventilaremos, pero eso no es cuestión de ese procedimiento.

"Sr. Vázquez: Es que él declaró eso en este pleito.

"Sr. Coll: Pero es que eso no es pertinente.

"La Corte: ¿Qué eficacia tiene para resolver el juicio, este pleito, el que le hayan ofrecido algo por declarar?

"Sr. Vázquez: Eficacia ninguna. No tiene valor ninguno, como cuestión de derecho; solamente como cuestión de hecho. Solamente para que la corte aprecie la actitud del demandado.

"Sr. Coll: Ninguna manifestación de un testigo puede imputarse a un demandado, ni a un demandante, y mucho menos cuando la declaración del testigo envuelve un delito. De manera que lo que puede decir el señor Vázquez es que el testigo ha dicho tal cosa y ha dicho tal cosa. Además, la corte va a oírme a mí sobre la declaración de Rodríguez en mi oficina y luego va a pesar las dos declaraciones.

"La Corte: Esas manifestaciones del testigo le parece a la corte que no tienen relación alguna con el caso.

"Sr. Coll: Yo no me voy a oponer a ninguna resolución de Su Señoría. Y yo no le pregunto nada más al testigo.

"Sr. Vázquez: Pues nada más."

El testigo Julio Cáceres declaró a preguntas del demandado:

"Me llamo Julio Cáceres, trabajo en la agricultura y en distintos negocios, conozco al Sr. Alonso como un propietario, pues he tenido con él relaciones de negocios en la compra de leche la cual iba yo a buscar en una guagua de motor. Conocí a aquella joven siendo novia del *chauffeur* mío, Félix Rodríguez. En distintas ocasiones lo fuí a buscar a casa de esa joven y entonces él se marchaba conmigo."

A preguntas de la demandante contestó:

"En esa época Irene Aponte vivía con el padre y la madre pero no sé dónde dormía Félix Rodríguez ni con quién dormía. Rodríguez era también *chauffeur* de Alonso."

Manuel Prida Izquierdo, respondiendo al interrogatorio directo, dice así:

"Me llamo Manuel Prida Izquierdo y estaba hoy aquí ocasionalmente en el edificio de esta corte cuando se veía este juicio; vivo en el barrio Hato Rey de Río Piedras y conozco a esa joven que está ahí sentada que vive cerca de mi casa. La conocí desde seis o siete meses y desde esa época para acá cada vez que yo pasaba frente a su casa veía por allí unos carros al frente de la casa; en muchas ocasiones

iba yo al cine y regresaba y la veía en la carretera. Yo veía visitas en la casa.''

A preguntas de la demandante contestó:

''Yo veía que las personas que tenían los automóviles hablaban con ella, nada más que eso.''

Pedro Castro declara lo siguiente, a preguntas del abogado de la parte demandada:

''Me llamo Pedro Castro, soy comerciante en Santurce, conozco a aquella niña que está allí sentada, desde el año 1931; la conocí en Hato Rey. Una noche la vi en el cine 'Estrella' y empecé a tratarla como costumbre de los jóvenes. Le dije que si quería entrar al cine y me dijo que sí y como yo tengo novia allí le dije al portero que me dejara dos sillas arriba desocupadas. Tuve contacto carnal con ella dos veces mediante una compensación de $2.00 la primera vez.''

A preguntas del abogado de la demandante, contestó:

''El comercio carnal lo tuve con ella en la parada 32 en una casita que había en la entrada de 'Las Monjas'. No me puedo acordar el día que entré con ella al cine ni el mes.''

Rafael Escobar, respondiendo al interrogatorio directo dice:

''Me llamo Rafael Escobar, vivo en la parada 35, Hato Rey, soy carpintero. Por ese barrio vivía esta joven. Yo trabajo con don Jesús Benítez Castaño y todas las noches acostumbro salir por el barrio ese y veía mucha gente llegar a la casa con bachata y carro y ella salía en los carros y yo después me decidí a hacer amistad con ella, a lo cual asintió. En la propiedad de don Jesús Benitez había unos ranchones de madera y ella consintió en tener allí trato carnal conmigo, más de una vez y yo le pagaba dinero.''

A preguntas del abogado de la demandante, contestó:

''No sé si allí había una casa pública de lenocinio y no puedo decir el nombre de ninguna persona con quien saliera ella en automóvil, pues eso me es muy difícil. En el año 1931 tuve concúbito con ella. A ese sitio podía entrar cualquiera libremente y hacer uso de las camas que había. No puedo precisar la época en que tuve concúbito con ella la segunda vez, pero dos o tres días después de la primera y le pagué $1.00.''

Marcelino Hidalgo declara así, respondiendo al interrogatorio directo:

"Me llamo Marcelino Hidalgo, soy empleado y conozco a aquella jovencita que está allí. Un domingo estaba yo en Santurce en la parada 22 y al acercarse ella un amigo mío se puso a hablar con ella y después de cambiar algún saludo y algunas frases observé que se tuteaban. Me la presentó el amigo y le pregunté si iba para Río Piedras y le invité a que se fuera con nosotros que íbamos para allá. Ella aceptó la invitación y montó con nosotros en el carro y la llevamos hasta Hato Rey, parada 35. En el camino íbamos hablando con ella comedidamente. En el resto de los días de la semana yo pasaba en distintas ocasiones por la carretera y la veía a ella la mayor parte del tiempo y después seguí viéndola paseando con unos y con otros."

A preguntas de la demandante, contestó:

"Yo no recuerdo exactamente el mes a que quiero referirme en mi declaración, pero ese día que la llevábamos para Río Piedras era como a las 4 de la tarde y llegaríamos a su casa como a las cuatro y veinte, pues íbamos poco a poco."

Ramón Alonso fué el último testigo producido por la parte demandada. A preguntas de su abogado, contestó:

"Me llamo Ramón Alonso Muñoz, conozco a la demandante, la señorita aquella que está allí. Primeramente la conocí viviendo en el barrio Monacillos de Río Piedras. A la madre la conocí primeramente. Después del ciclón de San Felipe un día fuí a mi finca en automóvil y me encontré con la madre de esa muchacha en la carretera y me dijo que si la llevaba a Río Piedras. Yo la llevé y por el camino me dijo que iba a cambiar un giro postal, que no sabía firmar y le firmé el giro y se lo cambiaron. Tuve un tiempo de amistad con la madre de la muchacha. Así fué como yo entablé amistad con ésta, nunca de novio y menos prometerle casamiento. Se vinieron para Hato Rey y un día ví al padre y me llamó y me estuvo contando la situación de ellos. Tuve contacto carnal con ella en la finca mía, a la cual ella había ido varias veces antes de ese día. Cuando yo tuve contacto carnal con ella para mí no era virgen, a juzgar por los síntomas no había nada de eso absolutamente."

Repreguntado por el abogado de la demandante, contestó:

"Confieso que he tenido dos veces concúbito con la demandante y soy el mismo que ha jurado la contestación a la demanda. Y era soltero en esa época y ella también. Félix Rodríguez fué *chauffeur* mío. Conozco a Eleodoro Torres, que fué mayordomo mío. Un día cuando ella vivía en Hato Rey fuí a su casa."

Volvió a declarar Irene Aponte para rebatir la prueba del demandado con respecto a los actos que se le atribuyen. A preguntas de su abogado, respondió:

"Soy la demandante, no conozco a Julio Cáceres ni nunca éste ha ido a mi casa a la una de la mañana a buscar a Félix Rodríguez, pues éste nunca ha dormido en mi casa. Tampoco conozco a Pedro Castro con quien no he tenido cita alguna en el Cine Estrella ni ha vivido nunca cerca de mí ni he tenido con él relaciones carnales. Tampoco a Rafael Escobar. Nunca he tenido amistad con éste ni contacto carnal con él, pues con el único que he tenido contacto carnal es con el demandado Ramón Alonso Muñoz. No conozco a Marcelino Hidalgo ni he ido con él de paseo por ningún sitio. Nunca he salido de mi casa con ninguna persona en automóvil ni he sentido después de acostada que persona alguna tocara klaxon alguno de automóvil cerca de mi casa."

Repreguntada por el abogado del demandado, contestó:

"Ahora no se paran automóviles frente a mi casa. No conozco al Dr. Boneta ni lo he visto nunca."

En este momento el letrado del demandado, Sr. Coll Cuchí, hizo a la testigo la siguiente pregunta:

"Dígame, testigo, no es cierto que viviendo usted maritalmente con un individuo de apellido Rivera el día 23 de noviembre de 1931 fué a donde el doctor Luis Boneta, en Río Piedras para que la atendiera de una hemorragia producida por un aborto de dos meses y que fué tratada por el Dr. Boneta?

"R.—Todo eso son embustes de usted, que me traigan ese Rivera que dice eso.

"P.—¿Y por qué no prefiere que le traigan al médico?

"R.—El médico y Rivera también, porque yo nunca he estado en eso."

Ésta es toda la prueba practicada. La corte inferior, al comenzar el análisis de la misma, nos dice que la demandante descansa en la doctrina sentada por este tribunal en el caso de *Tous Soto* v. *Chevremont*, 31 D.P.R. 381, al efecto de que "no es necesaria la corroboración del testimonio de la demandante ni tampoco la existencia de la promesa de matrimonio como elemento imprescindible para constituir causa de acción de daños y perjuicios por seducción." Continúa diciendo la corte que la demandante parece partir de la base de que su solo testimonio, de ser creído por el tribunal, es prueba suficiente de la seducción, y, por lo tanto, de los daños y perjuicios que alega se le ocasionaron; pero que en este caso el testimonio de Irene Aponte, si bien aparece corroborado por la declaración de la madre, ha sido también controvertido por la declaración del demandado. Conviene hacer constar que este testigo que, según la corte inferior, ha controvertido la declaración de la demandante, confiesa bajo juramento, cuando declara, que tuvo dos veces contacto carnal con la demandante, mientras que en su contestación niega insistentemente, también bajo juramento, que tuviese comercio carnal con ella.

La corte inferior incurre en un error de importancia al relatar detalladamente en su opinión el testimonio de Irene Aponte, a la cual atribuye las palabras siguientes: "Que era novia del demandado, con quien llevó dos años de relaciones para casarse; que no le dijo a ella que se casaría, pero sí se lo dijo a su mamá delante de ella." Ésta es la única vez que aparece mencionada la promesa de casamiento en la relación del testimonio de Irene Aponte hecha por la corte inferior, siendo de notar que se hace esta mención para decir que la demandante declara que el demandado no le dijo directamente que se casaría con ella, pero que se lo dijo a su mamá delante de ella. La verdad es que no en una, sino en repetidas ocasiones, Irene Aponte testifica, de una manera terminante y precisa, que el demandado le dijo que iba a casarse con ella.

Copiamos a continuación las razones expuesta por la corte inferior para poner en duda la veracidad de Irene Aponte:

". . . . La demandante es una joven que según su testimonio, siempre ha vivido al lado de sus padres, y que entabló amores con el demandado, el que, según manifiesta la madre de la demandante, 'quería tratarla porque tenía ideas de casarse con ella.' No obstante la buena acogida que aparentemente se le dió al demandado en la casa de la demandante, los padres autorizaban a diario la salida de su hija durante un largo período de tiempo, y no es hasta tres meses después de ocurrida la seducción que la hija lo notifica a los padres. Esta conclusión nos lleva a enlazar el testimonio del médico, el que parece hizo el examen rectal a solas con la demandante, y la que tuvo más confianza con el médico al decirle lo que le había ocurrido, que con su propia madre al reservarse para ésta y durante tres meses el acto de la seducción. Es, pues, la propia declaración de la demandante la que nos hace dudar de su veracidad. Si la seducción ocurrió, como alega la demandante, cuando ella tenía trece o catorce años, entonces no es posible considerar la declaración del demandado (*sic*) sobre los actos carnales realizados porque la perjudicada tenía menos de catorce años y era incapaz para consentir. Sería de aplicación la doctrina del caso de Lebrón v. Lebrón, 31 D.P.R. 891. Pero la propia madre de la demandante dice que no es hasta el 1931 que su hija le manifiesta lo que le había ocurrido con el demandado, en marzo del mismo año. Ya tenía más de catorce años. Esta prueba, unida al testimonio pericial, parece indicar o que hubo un lapsus en el testimonio de la demandante, o que las partes condujeron el examen de sus testigos con mucha prisa y no se pudo determinar con precisión el hecho cierto y exacto de la seducción, si es que la misma ocurriera. ¿Pero yendo más al fondo de la declaración de la demandante, podemos determinar por ella sola que la seducción ocurriera debido a la promesa de matrimonio que hiciera el demandado? La circunstancia de que en esta clase de pleitos ha de dársele gran peso al testimonio de la demandante, no excluye que dicho testimonio sea considerado por el tribunal con la misma justicia que el resto de la demás evidencia que se presente en el juicio, sin que deba influenciar el ánimo del juzgador ni la edad de la demandante, ni la circunstancia de ser mujer, ni su condición social. La declaración de la demandante debe ser considerada por el tribunal con aquella calma y sesuda reflexión que demanda la gravedad de esta clase de litigios por el alcance que su fallo tiene, no ya en la parte económica del demandado, sino en su aspecto moral."

La prueba demuestra que Irene Aponte salía con el demandado a paseo, autorizada por sus padres, y que un día salió de su hogar a las nueve de la mañana y regresó a medio día. La corte inferior se extraña de que se autorizaran estos paseos durante un largo período de tiempo, no obstante la buena acogida que aparentemente se le dió al demandado en la casa de la demandante. Sin detenernos a discutir, porque no es ésa nuestra misión, que los padres hayan hecho bien o mal en permitir estos paseos, no hallamos en ello base para arrojar sombra sobre la reputación de la demandante y establecer dudas acerca de su veracidad. Puede haber familias que no permitan a sus hijas salir de paseo con ningún hombre, y puede haber otras que autoricen estos paseos. La buena acogida que el demandado recibiera en el hogar de la demandante no es razón para que los padres no permitiesen los paseos de su hija. Por el contrario, las personas conocidas y acogidas con agrado en el seno de una familia son las que suelen inspirar confianza y las que cuentan a menudo con la tolerancia de los padres. La madre de Irene Aponte declara que trataba a Alonso como una persona de confianza y que dejaba salir a su hija con él por ser su novio y tratarse de una persona seria.

La corte inferior hace resaltar el hecho de que la demandante mostrase más confianza con el médico que con su propia madre, por haberle comunicado al primero que había perdido su virginidad y haber esperado tres meses para hacer saber a la madre lo que le había ocurrido. No es extraño que los hijos mantengan ciertas reservas para con sus padres y que se guarden de comunicarles sus yerros por temor a ser reprendidos, por el respeto que les inspiran o por no hacerlos partícipes de sus propias amarguras. Esta conducta, por censurable que pueda resultar en determinados casos, no es ajena o extraña a las debilidades del temperamento humano. Además, la demandante debía saber que no hubiera podido ocultar su desgracia al médico que la reconocía y que nada conseguía con negarlo.

Apunta la corte inferior que la demandante alega que la seducción ocurrió cuando tenía trece o catorce años, pero que la propia madre de la demandante dice que no es hasta el 1931 que su hija le manifiesta lo que le había ocurrido con el demandado, en marzo del mismo año. Irene Aponte declaró que cuando comenzó sus relaciones con Alonso tenía trece años de edad y que en el momento de la seducción tenía catorce, pero inmediatamente menciona la fecha en que fué seducida, fijando el mes de marzo de 1931. El 28 de ese mes y en el mismo año, cumplió quince años la demandante, quien declara que el doctor Moczó le recetó por última vez en el mes de marzo de 1931, como dos semanas después de haberse entregado a Alonso. De este testimonio, producido por la propia demandante y no exclusivamente por su madre, se deduce que no había cumplido quince años cuando ocurrió la alegada seducción.

A raíz de citar la corte inferior el caso de *Tous Soto* v. *Chevremont,* supra, sobre la no necesidad de la corroboración del testimonio de la perjudicada, ni de la existencia de la promesa de matrimonio como elemento imprescindible para constituir seducción, dice que la misma doctrina se sienta en *Hardin* v. *Davis,* 21 A.L.R. 302, y copia de la opinión emitida en este último caso lo siguiente:

"Si bien es cierto que una promesa de matrimonio es a menudo uno de los medios empleados por el seductor para ejecutar su propósito, siendo necesario que así se demuestre en una causa criminal, sin embargo, tal promesa no es uno de los elementos esenciales en una acción civil por daños. El comercio carnal inducido por persuasión, maquinaciones, engaño o cualquier otro artificio bastará, porque tal es la esencia del agravio. Pero la simple prueba de comercio carnal, sin más, no es suficiente para autorizar una indemnización. *Volenti non fit injuria.*"

No interpreta la corte inferior correctamente las palabras que dejamos transcritas y la ley aplicable al caso, a juzgar por los párrafos de su opinión que a continuación copiamos:

"En la declaración de la demandante no encontramos cuál haya sido la artimaña que constituyó el engaño, el artificio, la falsa promesa (aparte de la de matrimonio), que utilizó el demandado para rendir su castidad, virtud y virginidad. Puede ser que pesara algo en su mente el halago de un matrimonio ventajoso económicamente para la demandante; pero no hay prueba de aquella reiterada persuación o incitación a los deseos de la mujer, para que se rinda por parte del demandado. 24 R.C.L. 734 (5). Y en ausencia de tal prueba clara, robusta y convincente, no debemos dejar sin amparo los derechos del demandado, sin olvidarnos tampoco de los de la demandante. Parece que la demandada (*sic*) le da mucho énfasis a la palabra 'seducción' (*seduction*), que emplea el artículo 58 (texto inglés) del Código de Enjuiciamiento Civil, y le da un alcance y extensión que no tiene, a nuestro juicio, en su interpretación jurídica.

"⁎ ⁎ ⁎ ⁎ ⁎ ⁎ ⁎

"La prueba de la demandante se transparenta en sus elementos esenciales y convincentes y no deja en nuestra conciencia de juzgador aquella sensación de reposo, de confianza, de tranquilidad espiritual y certeza moral, que son necesarias para fallar un caso justo, moral y equitativamente. No encontramos las armas de que se valió el seductor y sin las que no hubiera rendido la castidad de la demandante. No nos explica ésta cómo fué la caída, ni su prueba la ayuda en este empeño.

"Hemos considerado detenidamente la prueba pericial y dándole entero crédito, ella no acumula elemento evidenciario alguno en contra del demandado, que pueda inclinar y decidir la decisión en su favor. Pudo la demandante ser virgen cuando fué examinada por el médico; pero el que dejara de serlo en el intervalo de uno a otro reconocimiento, no es, por sí sólo, fundamento adverso al demandado. Aparte de que la jurisprudencia nos dice que no es necesario que la demandada (*sic*) sea virgen al tiempo de la seducción; basta sólo con que sea virtuosa y casta."

Los tribunales han resuelto que la promesa de matrimonio es uno de los medios a que acude con frecuencia el seductor para realizar su propósito; pero que esta promesa no es en modo alguno un elemento necesario e imprescindible para que se cometa la seducción. Es decir, el acto carnal puede perpetrarse y cometerse la seducción sin que exista promesa

de matrimonio. En el caso de *Bradshaw* v. *Jones*, 103 Tenn. 331, 76 Am. St. Rep. 655, la corte dijo:

"Cualquier acto, ruego o manifestación que venza la resistencia de la mujer y culmine en su rendición, es suficiente."

De acuerdo con la doctrina expuesta, la perjudicada no está necesariamente limitada a probar la promesa de matrimonio. Su esfera de acción es más amplia, ya que puede probar, aunque no exista la referida promesa, que fué inducida al acto carnal mediante artificios, engaños o maquinaciones del seductor. Sin embargo, la promesa de matrimonio, cuando existe y se ha realizado el acto carnal bajo su exclusiva influencia, es suficiente para constituir una causa de acción. El comercio carnal por sí solo no es bastante, pero sí lo es, cuando es la consecuencia de la promesa de matrimonio.

En el caso de *Fletcher* v. *Ketcham*, 141 N. W. 916, resuelto por la Corte Suprema de Iowa, se dijo:

"Copiamos del alegato del apelante las palabras siguientes, que revelan el punto verdadero establecido por el abogado con referencia a la materia ahora bajo nuestra consideración: 'Nuestra simple contención es que cuando una pareja soltera ha tenido comercio carnal, la prueba de un compromiso para casarse no es ordinariamente, por sí sola, y sin más, suficiente para establecer un caso prima facie de seducción contra el hombre. En adición, debe haber evidencia de algún artificio o treta practicado en la mujer; debe haber por lo menos evidencia de solicitud, insistencia o persuación irresistible de parte del hombre y alguna repugnancia y duda de parte de la mujer.' Estamos obligados a sostener que si bien es cierto que no hay testimonio directo de la demandante con respecto a lo que la indujo a entregar su persona al demandado, sin embargo, el récord es de tal naturaleza que un jurado estaría justificado en inferir que se entregó en virtud de la promesa de matrimonio. Hubo amplia prueba de una promesa de matrimonio mucho antes de que ocurriera el comercio carnal, cuya promesa fué repetida, ya en términos expresos o por necesaria deducción, de tiempo en tiempo, hasta cerca de la fecha en que el demandado se casó con otra mujer. El acto carnal ocurrió después que el demandado se fué a vivir al hogar de la demandante y después de haberla requerido de amores y haberla prometido ca-

sarse con ella. Aunque hubiese sido más seguro y mejor haber inquirido de la demandante con respecto a qué fué lo que le indujo a ella a entregar su persona al demandado, nosotros, sin embargo, estamos obligados a sostener que esto puede encontrarse por deducción de otros hechos y que era una cuestión para ser resuelta por el jurado y determinada teniendo en cuenta el testimonio aducido.

"* * * * * * *

"El abogado cita algunos casos que parecen sostener que si una mujer se somete al acto carnal con un hombre en virtud de una promesa de matrimonio, esto no es seducción, sino una simple compraventa. Pero tal no es la doctrina de esta corte ni de las cortes en general."

 Hay dos testigos que declaran que tuvieron comercio carnal con Irene Aponte: Pedro Castro y Rafael Escobar. La corte inferior resume el testimonio de estos dos testigos del modo siguiente:

". . . . Pedro Castro declara que conoce a la demandante desde hace más de tres años; que ha tenido citas en distintas partes con la demandante y que ha realizado actos carnales con ella para fines de diciembre de 1930 y en el mes de febrero de 1931. Rafael Escobar declara que conoció a la demandante a mediados del año 1930; que tuvo actos carnales con ella a fines de 1930 y a principios de 1931 . . ."

Hemos examinado la declaración de estos testigos y ninguno de ellos dice que tuviera actos carnales con la demandante, a mediados o a fines de 1930. Los dos se limitan a decir que estos actos ocurrieron en 1931. Si estos testigos, como dice la corte inferior, hubiesen declarado que tuvieron contacto carnal con la demandante con anterioridad al año de 1931, su testimonio estaría en abierto conflicto con la declaración del Dr. Moczó, quien afirma que examinó a Irene Aponte en febrero de 1931 y que para esa fecha era virgen. Fué a fines de marzo del mismo año que el Dr. Moczó, en un nuevo examen que le hizo a la paciente, se enteró de que había perdido su virginidad. Ninguno de estos testigos dice en qué fecha de 1931 ocurrieron los actos carnales mencionados. Si aceptamos que el Dr. Moczó dijo la verdad, estos actos, de ser ciertos, tuvieron que ocurrir en febrero o con

posterioridad a esa fecha. Irene Aponte alega y declara que fué seducida en marzo de 1931. El demandado no ha probado cuándo tuvieron lugar estos actos carnales relatados por estos dos testigos y era su obligación demostrar que fueron anteriores a los actos realizados por dicho demandado. Aunque la prueba de actos específicos sea admisible, sin haber sido alegados, hay que convenir en que la demandante se encuentra en una posición desventajosa, teniendo que enfrentarse con cargos formulados en el momento del juicio, en los cuales interviene algún elemento de sorpresa.

La demandante negó rotundamente las imputaciones de que fué objeto al comparecer nuevamente como testigo para rebatir la prueba del demandado; pero aun en el caso de que los actos que se le atribuyen fuesen ciertos, si se realizaron con posterioridad a la fecha de la seducción, no pueden destruir el derecho de Irene Aponte a reclamar daños y perjuicios por haber sido seducida. Y el demandado no ha probado que estos actos fuesen anteriores a la fecha en que se alega se cometió la seducción.

Del caso de *Shewalter* v. *Bergman,* 23 N. E. 686, resuelto por la Corte Suprema de Indiana, copiamos lo siguiente:

"No tenemos dudas de que la corte actuó correctamente al excluir evidencia tendente a demostrar que la reputación de la demandante fué mala después de la seducción. Si la reputación de la demandante fué buena al tiempo en que ella se entregó en los brazos del demandado su subsecuente caída no puede afectar su derecho a recobrar. Su conducta posterior no tiende a probar que cuando el demandado la sedujo ella no fuese una mujer casta. Su reputación perdida, si siguió a la seducción, puede muy bien ser atribuída al propio error del demandado, y de este error no puede él aprovecharse. La persona que causa la mala reputación de otra, no puede derivar beneficios de su conducta ilegal."

Habla la corte inferior de una prueba clara, robusta y convincente. Desde luego, que la prueba de la seducción debe ser suficiente para satisfacer la conciencia del juzgador;

pero no es necesaria una prueba como la que se requiere en casos criminales.

En *Kralick* v. *Shuttleworth*, 289 Pac. 74, resuelto por la Corte Suprema de Idaho en junio de 1930, se dice:

"En una acción civil basada en daños ocasionados por seducción, todo lo que es necesario para obtener indemnización es que haya una preponderancia de evidencia en favor del demandante como en otras acciones civiles. 2 Chamberlayne on Modern Law of Evidence, sec. 998; Nelson v. Pierce, 18 R. I. 539, 28 A. 806."

Hemos apuntado los errores que a nuestro juicio ha cometido la corte inferior por la influencia que indudablemente han ejercido en el proceso de elaboración mental del juzgador, conduciéndolo a establecer conclusiones basadas en equivocadas premisas. La corte inferior, dándole entero crédito a la declaración del Doctor Moczó, dice que no acumula elemento evidenciario alguno en contra del demandado que pueda inclinar la decisión en su favor, es decir, en favor de la demandante, cuyo nombre no se menciona, sin duda por error. El Doctor Moczó nos dice que examinó a la demandante en el mes de febrero de 1931 y que entonces era virgen. No menciona el perito, ni tenía necesidad de mencionar, al demandado. Su informe se limita a dar cuenta del reconocimiento que practicó en la paciente. Su declaración, sin embargo, es un elemento importante, porque demuestra en una fecha determinada la virginidad de la demandante. La pérdida de esta virginidad tuvo que ocurrir necesariamente después de esta fecha. La declaración de Irene Aponte demuestra que fué seducida en la primera quincena de marzo, porque fué reconocida por el Doctor Moczó en dicho mes, como dos semanas después de haberse entregado a Alonso. De manera que, según la demandante, entre el reconocimiento y la seducción mediaron solamente algunos días. El demandado confiesa que tuvo contacto carnal con Irene Aponte, pero no determina la fecha, a pesar de que conocía las alegaciones de la demanda y de que la perjudicada había declarado que fué seducida en el mes de marzo de 1931. El demandado

aceptó el contacto carnal y no contradice el testimonio de la demandante en cuanto a la fecha en que tuvo lugar.

Cuando Irene Aponte declara rebatiendo la prueba del demandado lo hace con vigorosa energía. Se le pregunta si no es cierto que viviendo maritalmente con un individuo de apellido Rivera, el día 23 de noviembre de 1931 fué donde el Doctor Boneta para que le atendiera de una hemorragia producida por un aborto de dos meses y que fué tratada por el Doctor Boneta. La demandante responde que todo eso son embustes y que le traigan a ese Rivera que dice eso. Se le interroga que por qué no prefiere que le traigan al médico y contesta: ''El médico y Rivera también, porque yo nunca he estado en eso.'' El demandado no se cuidó de traer al Doctor Boneta ni al individuo de apellido Rivera para demostrar la veracidad de sus insinuaciones. Aunque se trata de un hecho posterior a la fecha en que ocurrió la seducción, la verdad es que insinuaciones de tal naturaleza, ajenas a toda prueba, no pueden ser bastantes para destruir la reputación de una mujer y deben pasar sin dejar huellas por la conciencia del juzgador.

Eleodoro Torres, mayordomo que fué del demandado y quien por su testimonio demuestra ser un testigo desinteresado, dice que Irene y Alonso eran novios y que no sólo lo sabía él personalmente sino que también era público y todo el mundo lo veía visitar diariamente la casa de Irene. La reputación de Irene era magnífica y era una niña que se ocupaba de los quehaceres de su casa. El testigo es casado y su familia y la de Irene se visitaban periódicamente. La prueba demuestra que el demandado visitaba con frecuencia la casa de Irene. Sus solicitudes, sus invitaciones y sus paseos producen la impresión de que fueron medios puestos en práctica para realizar sus propósitos. La corte inferior ha incurrido en manifiesto error al apreciar la prueba. La seducción ha quedado establecida y la sentencia debe ser revocada.

No se aportó prueba alguna acerca de la situación finan-

ciera del demandado. Carecemos de este dato, que hubiéramos tenido en cuenta al apreciar la cuantía de la indemnización, y en ausencia de esta prueba, nos permitimos fijar la cantidad de $2,000 en concepto de indemnización por los daños ocasionados a la demandante, con imposición de costas a la parte demandada.

*Debe revocarse la sentencia apelada y dictarse otra en su lugar, de acuerdo con los términos de esta opinión.*

El Juez Asociado Señor Wolf está conforme con la sentencia.